We'll call the first matter listed for argument this morning, which is the Government of the Virgin Islands v. Kenrick Maynard. Mr. Quinn. Good morning, Judge Smith. Michael Quinn of the Catholic Conference of New Zealand for Appellant Kenrick Maynard. Excuse me. Please. And good morning also, Judge Chigaris and Judge Jordan. May it please the Court, I would first like to ask the Court's permission to reserve three minutes of my argument time for rebuttal. Granted. Thank you. Your Honor, your Honors, plural, it's often been said that... Excuse me. Before you get started, I wanted to, first of all, thank you for accepting the appointment. It's a very great honor, sir. Thank you. In this case. I also, because of the relatively short time between the appointment and the scheduled oral argument in this case, simply inquire for record purposes if you're satisfied that you've had adequate time to prepare the case and to fully understand the issues that have been presented to you. And this will not be attributed, Margaret, to his time. We can start the clock once he begins. Thank you for the inquiry, your Honor. Yes, I am satisfied that I've had a full opportunity to prepare for argument and know the issues and the law. And you've had an opportunity during that period also, I'm sure, and I assume you have availed yourself of the opportunity to consult with Ms. Miller, who was previously counsel in this case. Yes, your Honor, I have. And you've consulted with Mr. Maynard in the course of the preparation time. We had a lengthy telephone conversation, your Honor. All right. Again, we thank you for accepting the appointment and we'll proceed to hear your argument. Thank you, your Honor. And may it please the court. As I had begun my statement, it's often been said, and it's been said by the Supreme Court, that a defendant's not entitled to a perfect trial, just a fair trial. Well, the record here reflects that the defendant did not get a fair trial at all due to the fact that there were two egregious Brady violations. I don't often use that term, but it's clear to me that that's what happened. Let me ask you about that, because in your reply brief you put, you, your predecessor, somebody put the argument about Ms. Weeks' crack addiction and pathological liar comment before addressing the names of the people arrested. And I'm wondering if, does that reflect any judgment about which is in the defense's mind the more significant of the problems? No, your Honor, it doesn't. I mean, it's the defendant's position that both violations are of equal value, to lack of a better word. That was going to be my follow-up question. You've used the word egregious. You don't regard one as more, of greater seriousness nor greater effect in terms of prejudice? They are two different things, Judge Smith. The suppression of the names prevented the defendant from investigating the connection of those six people to the murder weapon, or whether those six people had a grudge against Mr. Himes Sr., which might have supported an inference that they were involved in the murder. With respect to the statement in the Department of Health file that Ms. Weeks was a pathological liar. How would that have been used? Just how would the defense have gone about proffering the characterization of her as a pathological liar? And by that, I am asking how it would have been admissible. If that document had been produced in a timely fashion pursuant to Brady's requirements, the defense could have called someone from the Department of Health, the counselor who wrote the report, to render their view on the treatment of Ms. Weeks and why they came to that judgment as affecting Ms. Weeks' overall credibility rather than that she was lying about anything specific. I understand that that would be the desire of counsel. I understand that would be the intended purpose. But specifically, how would you have gone about, how would trial counsel have gone about proffering for purposes of suggesting an admissible basis of this opinion? And how would it have come in? Because clearly, if it is neither in and of itself admissible or if the defense can't provide us with some basis as to how it might have led to admissible evidence, then there's not going to be any prejudice as to that nondisclosure. No, I understand, Your Honor. I believe it's twofold. The argument before Judge Hodge at trial was that extrinsic evidence, unlike under Rule 608B of the federal rules of evidence, extrinsic evidence can be used under the local rules of evidence to impeach a witness. And therefore, the report, if it was properly authenticated through a witness from the Department of Health, could have come in under, let's see if I have the specific rule, it's Title V, Section 834, Evidence Generally Affecting Credibility of the former Uniform Evidence Code that was repealed about two weeks ago here in the Virgin Islands. And I refer the court to Phillips v. People of the Virgin Islands, it's 51 VI 258, a 2009 opinion of the Virgin Islands Supreme Court, which will clarify for the court that the uniform rule of evidence would have applied in this situation and not Rule 608B. Assuming that's true, Mr. Quinn, if I've got the facts right, the subpoena that was served by defense counsel was not served until the trial had begun. That's... And said they won't give them up without a subpoena. At that point, why isn't it incumbent on the defense, if it wants the records, to issue a subpoena and not wait around and keep saying to the prosecutor, get me those records? That's a good question, Your Honor. But I think the facts are somewhat different than Your Honor has stated. Initially, AAG Holder was ordered by the court to go to the Department of Health to obtain the records. And his response was, they will not give me anything without a court order. Right. Okay. Attorney Holder, the people were still under the court's order to go get the documents. I don't see anything in the record. There's kind of a disconnect in the record, as far as I can tell, between what happened then, because defense counsel didn't apparently ask the court, enforce your order and make Attorney General Holder go get those documents. The next thing that appears in the record, as far as I can tell, is at trial, the defendant subpoenaed the Department of Health itself. So my question stands. If you know they're there and you know that the Department of Health won't give them up without a subpoena, why doesn't the defense – I mean, is there no consequence to the defense of failing to go and get something that they know is there and want to have? That's the point I was trying to make and didn't make. The assistant holder did not say that the records actually exist. What he said was – if I can point it out specifically. He didn't say they don't exist. My impression was he said if you want something about Ms. Weeks from the department, you've got to get a subpoena. Well, he said two things. One thing he said is, quote, it's my information that she has not been treated for anything. It's my information she has not been treated for anything, and that's at Joint Appendix 132. On the same page, he says that the Department of Health will not release anything without a court order. So he's not confirming the Department of Health has anything, just that they won't release anything without a court order. Because the people were under court order already to go get any documents in the Department of Health's possession, I think the defendant was entitled to rely on the continuing force of the court's order for the people to follow up. Apparently, at some point, defense took it upon themselves to subpoena the records. Yeah, not till trial. I guess that's my – I understand Brady to require the defense to be reasonably diligent in going after material it can get. Yes, Your Honor. How does a failure to subpoena records from the Department of Health until trial has already begun meet the reasonable diligence requirement? If by any stretch, by that point, a defense counsel has got to know, hmm, I'm not getting it from the government, how come that fits reasonable diligence? Well, that's a good question, Your Honor. Under Bagley, when the government says things that sort of lull the defense into not taking action in pursuit of Brady material, the defense is entitled to rely on that lulling. Here, we have a court order that the prosecution go out and get those documents. I don't see any follow-up between that point and where we subpoenaed the documents ourselves. But I do believe that the defense was reasonably entitled to rely on the government's obligation to go get those. There was not a big time period between the September 10, 2001, conference where this came up originally. Is there anything in the records suggesting that the defense did anything to secure those records prior to trial? No, Your Honor. No, it appears that the subpoena was issued at, shortly before, at, or during the trial to the Department of Health. And the Department of Health showed up on the last day of trial with the records, as it turns out. The trial court denied a request for a short continuance. Well, short continuance, the jury already had the case accepted, right? Well, let me take, Your Honor, through the steps. Mr. Maynard testified, and then they were around the lunch break. The DOH witness had not shown up. The defense counsel asked if we could go to the lunch break, maybe he could put on his witness. He didn't want to rest at that point. He couldn't put on his witness after lunch, so the court said, let's break for lunch. I don't read that as a grant of a continuance, which both the appellate division and the trial court referenced in their respective decisions. In any event, when they get back from lunch, defense counsel specifically says, the DOH person isn't here, I'm requesting the court's assistance. They're on the phone or something like that. Please get on the phone with the DOH person and order them down here, and the court does not do that. Later on, the trial court's opinion says, I offered the court's assistance to get that person down here, and it was turned down. But the record does not support that conclusion, and both the appellate division and the trial court reached that conclusion. It's not supported by the record. Do you have any other questions on this? I just had a question about the six witnesses. Now, your other claim obviously deals with the six witnesses, their identities. Now, as I read the record, granted, you may not have had the names on time, but you were able to argue to the jury about this, not only the six other people who were arrested, but also maybe the shoddy investigation by the FBI. Not only that, but then you had four weeks after the verdict came in to prepare your post-trial motion. Now, wouldn't you have had time to do an investigation then? And as far as I can tell, I guess whatever investigation you did, the defense did, did not bear fruit. So how is it reasonably probable that if you had it 30 days or four weeks ahead of time, the result would have been different? Judge Chigars, I'm not sure why the defense counsel did not try to find those names after the trial was over. I don't think it's material for purposes of our argument here today. Isn't it? Don't you have to show that it would be reasonably different, the outcome? Let me back up for a second, Judge Jordan. If they had the names, that's a good question. If they had the names, they could have investigated before the trial or if the trial were longer, I suppose, and they had a chance during the trial. It wasn't. It was a very short trial to investigate the connection of those people to Hyman Sr. who got shot and try to tie any of those people to the shell casings that were not tested by the FBI. But the defense knew that there were names. They knew there were individuals who had to have names. Yes, Your Honor. The defense simply didn't have the names. Yes, Your Honor. They knew how many people actually were involved because those individuals were at least designated by some kind of internally generated number on the document that was disclosed, right? Yes, Your Honor. There were arrestee numbers on the document. So wasn't there an obligation on the part of the defense to do something with knowledge that there were those people out there connected to the AK-47? Okay. Judge Smith, the prosecutor that was prosecuting the Maynard case was also the prosecutor that was in charge of the case against the six individuals. I know. Clearly, he had the names. He knew. He had to know. I understand that. Okay. But the defense also knew what they had and what they didn't have. And it's not much of a jump from the availability of a document that shows, what, six individuals involved? Yes, Your Honor. Designated by a number. Very few people at birth are given a number rather than a name. It's not a huge leap to assume that those individuals had names and that somehow those names were obtainable. They were identified by arrest number, which apparently is an internal number at the Justice Department here, which the Justice Department could have easily interpreted. You're right. The appellate division... Nobody's excusing them for that. We're trying to find out about what the defense didn't do. Yes, Your Honor. I'm sorry. I have a long way of getting to the point sometimes. And the appellate division said, you had the numbers. You should have gone out and found the names. But there's no indication of any way that those numbers could have been converted into names by a private party without any access to any other information. Where would they have gone to find the names? The district court made a finding of fact that the defense had all the information necessary to discover the names. Yes, Judge Chigars, but it didn't say what that information was. It just said the numbers. It didn't say what that information could have turned into or how. There's no inquiries to that area at all. Excuse me. Did the defense ever, even post-trial, say to the court, we've got the names now, Your Honor. Give us a little time. We think that we can develop information that will show that Mr. Maynard isn't the person. We want to talk to these people now that we know who they are and we didn't have a chance to before. We want to develop this information. Well, moreover, they had four weeks to put their papers together. I mean, I think it's conceded that nothing happened in those four weeks. Is there anything in the record to show that they ever asked for time and wanted to do that? I believe not, Judge Jordan. In the reply brief, in fact, page seven, it says, certainly if the defense could place the murder weapon in someone else's hands, it would raise the reason about the defendant's favor. So even still, as of October 2009, it looks like conjecture, right? I don't know why the former defense counsel didn't investigate those six names after they had the six names which they got at trial. Would you concede that having the names and not doing anything with them kind of undercuts the force of the argument that if we had it before, everything would have been different? No, Your Honor, I don't concede that. You probably shouldn't. That's okay. No, but I'm being sincere when I say that because if Mr. Maynard is – I think defense counsel should be doing all they can to develop newly discovered evidence. There may be a time bar on it now. It was 2001. But if Mr. Maynard gets a new trial, I'm sure he'll do everything he can to tie those six individuals to the gun. All right. We'll have you back on rebuttal. Thank you all very much. Thank you. Mr. Davis. Good morning, gentlemen. Richard Davis, Assistant Attorney General from the Virgin Islands Department of Justice for the people of the Virgin Islands. Let me ask you at the outset a pretty broad but also, I hope, rather pointed question. Do you find in any way defensible the failure of the prosecutor to turn over these names when requested? I don't know the circumstances. I don't know what might have motivated him not to do that. But surely, fairness and Brady would dictate that they should have been turned over. And that being the case, when you make your statement on page 10 of your brief that the defense argument is, quote, unconvincing as there is no evidence that the government suppressed any of the information, how can we take that seriously? I mean, there's a series of requests and repeated misstatements, just frankly, kind of bald misstatements, that the names aren't available when they obviously are available and they show up at trial. Is there no consequence? And bear with me. I want to read to you from what I understand stood the Superior Court to say The Superior Court judge says, you can't walk into court at the last minute and produce information that you should have produced and the defendant asked specifically for on four different occasions, in front of me at least, and you get up and say you didn't have it. Your problem is that you cavalierly deal with these cases as if it doesn't matter. You don't have to produce it. That's it. You don't seem like you think you have to investigate. Any other officer in your department, whatever they have, you have. And I'm getting tired of you, in particular, of these last-minute producing things, unquote. And he goes on. He obviously is disturbed by attorney holders' behavior. So my question to you, particularly when he says you in particular, which seems to indicate that this is a repeat offender, is there no consequence to a lawyer who just seems to think, you know, Brady doesn't really apply to me? Your Honor, I think that's just part of it. I think the other part of it is that he did supply, that we did supply, this RPR, this receipt, which clearly provided definitive and authoritative information about that arrest and made available to defense, as the district court said, all the information they needed to get those names. Those numbers are arrest numbers. All that someone would have to do would be to take those numbers to the police department, to the records room, and give them those numbers and ask for those names. Those names were something that Mr. Holder should have provided, right? You're not suggesting that Mr. Holder was at liberty to withhold them, are you? I cannot speak for Attorney Holder. I can say— Well, I'm asking as a pure question of law, Mr. Davis. He was not at liberty to withhold that under Brady, correct? Well, again, I'm not sure that that information is Brady material. I'm not sure that it's at all probative, that it's at all relevant to the manner on trial. Having the identity of six people arrested with the murder weapon doesn't strike you as information that could be exculpatory? I'd say it is— Not relevant to guilt or innocence? I'd say it's potentially exculpatory. It's potentially relevant to good or innocence, in and of itself. It may not—I don't think it really represents that much. And I would say on Attorney Holder's behalf, you know, that— I'm shocked, quite frankly, Mr. Davis, to hear you say that. I'd say that the names— It's bad enough to see the concatenation of events, which I think this panel would agree is clearly prosecutorial misconduct, and have you stand then before this panel and attempt to minimize it in that fashion—and that's probably putting it mildly—is, to say the least, disturbing. Well, Your Honor, I wouldn't try to minimize that. The record I hear, I think, speaks for itself, and I think Attorney Holder certainly was less than forthcoming in this case. Is Attorney Holder still with the office? Yes, he is. I hope you will convey to him—and we ask you, I ask you, and I hope my colleagues join me in this— I ask you to personally convey to him our distaste for the behavior that this record demonstrates in the handling of this matter in particular, the identity of the six individuals. Yes, sir, I will do that. But to get back to the case, I do believe that there are—that there really is not much here in these arguments that—with respect to— The district court made—the trial court made a finding that the defendant had all the information to discover those names. I'd like to know where in the record there's support for that particular factual finding. Again, this comes out of a piece of discovery, what's called the RPR report that was turned over, and on that report, as I understand it, there's information about the property that was seized. In this case, I think there were three guns or maybe three or four guns, and I think six individuals. And the individuals on—well, and the form that was turned over listed only the arrest numbers of those individuals. At the trial, the officer who had made those arrests came to testify, was cross-examined by the defense as to what went on with respect to those arrests, and he produced an original document or a different document that had all the names. Attorney Holder had never seen that original document, and as you've pointed out, he was the prosecuting attorney in that case, but those charges were dropped. Are you suggesting that the mere fact that he had not seen a document generated by law enforcement authorities with whom he was working and who were integral to this investigation and prosecution somehow exculpates him from responsibility to find such a document? If that's your position, in my view, it certainly is not consistent with what this court has said is part of the obligation of a prosecutor. No, sir, I think that he had a receipt, a property receipt, which he assumed was the property receipt. He's not entitled to assume, Mr. Davis, is he? I mean, Brady and his progeny make clear that the obligation on the prosecutor, he's charged with constructive knowledge of the information that's in the hands of law enforcement, and indeed, he was working on this case. So, more to the point, he made affirmative representations. He told the defense the names aren't available. I mean, even if one were to assume, which we don't because it's flatly contradicted by the law, that he wasn't under an obligation to get the names. He clearly was under an obligation not to say, well, they're just not available. You can't get blood out of the stone. These names don't exist in our records when he hasn't done anything to check. I mean, isn't that just a flat-out misrepresentation? It would seem to be. Okay, so the question then that has to be responded to isn't, well, the defense should have looked for this. The question that has to be responded to is, what's the consequence when a prosecutor just flat-out misrepresents the availability of information and then shows up at trial with it? I mean, is it an answer to that to say, defense, you should have looked for it, even though I told you it didn't exist? I think that that characterization is a bit harsh. Well, isn't it factually accurate? Not entirely. He did not have the personal knowledge of the existence of that list that contained the names. He said you can't get blood out of a stone. These names, I can't give you these names. Isn't that just saying there's no way the police can give this to you? We don't have it? That's what he was saying. And doesn't the history of this case then demonstrate that it certainly was information that was obtainable by him? Well, it suggests that it's information that might have been obtainable by him. But he at least had constructive possession of it, right? His investigator had it. It was obtainable because he did obtain it. He showed up at trial with it. Well, the police officer witness showed up at trial with it, not Attorney Holder. Well, who had the police officer show up as a witness? Well, Attorney Holder did that. So how is it that you can stand and say, well, not really a Brady problem in the sense that it was just as available to the defense? It clearly wasn't just as available to the defense, was it? Well, it was perhaps not just as available, but it certainly was available to the defense. In fact, at that pretrial, well, no, I strike that. I would just say that the Brady issue, it goes beyond the initial question of whether there was some suppression to deal with what it was that was suppressed. And in this case, in both of these matters, none of it, I don't believe, was direct probative evidence or exculpatory evidence. All that it was were the possibilities of that. I think that the statements regarding the witness were clearly inadmissible under local law as well as under the federal law. Well, answer your opponent's assertion that under United States v. Bagley, information that's withheld that causes a defense theory to be abandoned is information that represents a Brady violation. The withholding of it represents a Brady violation. That's what I understand them to be saying, that Bagley supports the position that if you don't give them information, and as a consequence they can't pursue a specific defense theory, you have violated Brady. What's the government's response to that? They were not prevented in any manner, and in fact did not. They continued to pursue both of those theories that they had at the trial with respect to the crack usage of the witness, Mrs. Weeks, and with respect to the arrest and how in fact the weapon was brought to court. You see no difference between having names of potential witnesses in advance of trial so that investigation could be done and having witnesses in the middle of a day and a half trial? That strikes you as functionally equivalent? No, sir. Certainly it would be more advantageous to have the names ahead of time. But on the other hand, the names were not exculpatory evidence. The arrests came months after the shooting. The police didn't have enough evidence to tie those people who were arrested to the guns. So I don't know how the defense would tie those people to the guns. They at least should have the opportunity to try. Well, I would agree they should, ideally. But I don't think that they were prejudiced in this instance by not having that information. How can you say that in the same breath? I don't understand how those two things can come out of your mouth without even a breath in between. If they should have had the opportunity, because it does bear on their opportunity to develop potentially exculpatory evidence, and they didn't have the opportunity because the prosecutor misrepresented the availability of the information, how can there be a statement of no prejudice? Because the information is very remote from the subject matter of the trial. There was never established by the police or anybody else the connection between those six people who were arrested and the guns. And under the best circumstances for the defense, it might possibly suggest that someone else might have possessed the weapon at a later time. But the defendant, when he testified, never denied his possession of the weapon, and he never alleged that somebody else shot her, shot the victim. The defendant never brought that up. That was not an issue that the defense brought out at the trial. And so the question about these six names, I think it's not the kind of information that Brady would tend to tell to prevent. Although I agree, ideally it should have been turned over. An attorney holder, I think, acted badly, very badly, in not doing so. Is there any consequence? Just out of curiosity, has attorney holder had anything happen to change the behavior? One consequence that didn't occur is Mr. Holder should be the one having to stand here and be beaten up, not you, quite frankly. He should argue this case. I guess it's just part of the job, but I will speak with him. The way this case was handled. But I would say that there's very little difference between the IRP that was provided, the RPR, that was provided to the defense prior to the trial, weeks ahead of trial, and the one that was brought in at trial. It was not a complete surprise. And the information contained thereon, defense had the opportunity, had it chosen to, to go and to secure that information. And also with respect to the week's information. At the pre-trial hearing, several weeks before the trial, the judge really told both sides how to go get the evidence, made the offer to help either side secure that evidence, and neither side made any effort to, to, to go get it. And again, I think that, that you say, you say in your brief that the information about Ms. Weeks was quote, not impeaching. Close quote. That's page 14. How, how can a statement from a healthcare provider that Ms. Weeks is a pathological liar? Well, first of all, I do not. Not be impeaching. First of all, I don't believe that the statement is by a healthcare provider. The statement was made, I believe, by an intake person at the Department of Health, a social worker at best. Secondly, the fact that it was also attenuated, it was two and a half years prior to the incident, three or four, three years or longer before the trial. And it's not, and it is, you know. That makes it not impeaching? Well, I don't think it's proper impeachment material for their, I think, I think opinion testimony as, you know, can, can be brought in under some circumstances. But this intake worker is not the kind of person who's in a position to provide opinion testimony, I don't think. And beyond that, the, the, the, the, the witness's use of crack was brought out to the jury. The defendant was able to ask questions of her regarding her use of crack. And finally, the judge did instruct the jury with respect to the use of the drugs and the witness. Having no further time, if there are no further questions. Mr. Davis, we appreciate your indication that you will take back to Mr. Holder. At least some of the reactions of this panel to what the record demonstrates were counsel's nondisclosures and transgressions here. Thank you. Thank you. Rebuttal. Yes, Your Honor, may I please support. I do not say this lightly, but having been in this jurisdiction for two years now, I will tell you that. If Brady violations were predicate acts, the agency's office would be a Rico enterprise. And while I always had confidence that the court would take a keen interest in this case, I, I, I do appreciate what I, what I see the court doing here. Let me ask you a question. I think it's important for you to take head on. Mr. Davis had the unenviable task here of defending some indefensible behavior. But one thing he has said, which is significant and requires a response, is that you need to be able to show prejudice associated with the failure to provide the names. How, what is, what is the demonstration of prejudice that the defense can make in the absence of saying, well, we, we would have done this, we would have done that. Is there anything other than guesswork about whether people would have spoken to you and if they had spoken to you, what they would have said that would lead this court to be able to say, there's a reasonable probability there would have been a different outcome had those names been disclosed. Should have been. In a case, that's a, that's a very good question, Your Honor. In a case where the evidence itself leads to a different defense theory, it's somewhat, in my view, more difficult to establish what Your Honor has asked. The prejudice that's apparent is being able to call these people, well, let's see, I take that back and strike that. The ability to investigate any, at any time, to investigate any connection between these six individuals and the decedent in this case, for one, or the shells that were recovered on the scene, for two. The fact that that wasn't followed up on does weaken the argument, I think, Your Honor. But the question is, at the time, what should have happened when that nondisclosure took place at trial? There was no time at all for any other theory to be developed. And that in itself. So you, you really have to rely on the mere brevity of opportunity here. Is that really what it comes down to? Because, yeah. And that, that was just simply too short a time. Yes, Your Honor. What the argument comes down to. Yeah, because, because there was no follow up to try to establish a connection between these six individuals and the murder weapon, I do have to agree with Your Honor on that point. It's awfully clear to me what happened. As soon as the prosecutor's office determined that this was the murder weapon, they dropped the gun possession case against these six guys. It's like inferring that somebody comes in, it's wet, it's raining outside. It couldn't be any clearer than that. And not giving the names until the middle of the trial was just part and parcel of that approach. They wanted a conviction in this case and basically did anything they could to get it. All right. Thank you very much. Thank you all. Thank you, counsel. We'll take the case under advisement.